IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TRACY OWEN PURDIN,                    )
                                      )
            Plaintiff,                )
                                      )
    v.                                )    CIVIL ACTION NO. 2:12-cv-171-CSC
                                      )              (WO)
CAROLYN W. COLVIN,                    )
Acting Commissioner of Social Security,[1]  )
                                      )
            Defendant.                )

## MEMORANDUM OPINION

### I. Introduction

On December 24, 2008 the plaintiff, Tracy Owen Purdin, protectively filed a Title II

application for a period of disability and disability benefits and a title XVI application for

supplemental security income. (R. 11; 101; 105).  Purdin alleges disability beginning

November 6, 1998. (R. 11; 101; 105).   After the claims were initially denied, Purdin

requested and, on June 23, 2010, received a hearing before an administrative law judge

("ALJ").  (R. 26, 83).  Following the hearing, ALJ Katie H. Pierce denied the claim on

October 7, 2010.  (R. 21).  On January 4, 2012, the Appeals Council rejected a subsequent

request for review.  (R. 1).  The ALJ's decision consequently became the final decision of

the Commissioner of Social Security ("Commissioner").[2]  *See Chester v. Bowen*, 792 F.2d

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

[2]Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No.
103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social
Security matters were transferred to the Commissioner of Social Security.

129, 131 (11th Cir. 1986). The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3). Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be affirmed.

## II. Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[3] the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[3] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## III. The Issues

**A. Introduction.** Purdin was born on September 15, 1970. (R. 158). He was 28 years old on the alleged disability onset date and forty years old on the date the ALJ issued an opinion in this case. (R. 11, 21). He has a GED and some college education. (R. 32).

---

[4]*McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. *See Sullivan v. Zebley*, 493 U.S. 521, 525 n.3 (1990). Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Sullivan*, 493 U.S. at 525 n.3; *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

Purdin alleges that his disability onset date was November 6, 1998. (R. 11; 101; 105). He last worked as a sales associate in an office supply store in 2001.[5] (R. 32). From 2001-2008, Purdin was jailed, convicted, and imprisoned for child molestation and child pornography. (R. 32, 191, 301). His past employment history also includes work as a forklift operator and bartender. (R. 32-33, 39). He alleges that he is disabled due to bipolar disorder, obsessive compulsive disorder, generalized anxiety disorder, and chronic back and knee pain. (R. 31, 33).

**B.    The Findings of the ALJ**

The ALJ found that Purdin has the following severe impairments: bipolar disorder, obsessive compulsive disorder ("OCD"), borderline personality disorder, and generalized anxiety disorder. (R. 37). The ALJ also found that Purdin had a nonsevere impairment of very mild atherosclerotic vascular disease of the abdominal aorta. (R. 13). The ALJ found that, due to a lack of objective medical evidence, Purdin had not established a severe impairment of back and knee pain; however, "in an effort to view the evidence in the light most favorable to" Purdin, the ALJ considered Purdin's alleged back and knee pain in determining Purdin's residual functional capacity. (R. 14).

The ALJ concluded that Purdin does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part

---

[5]The Commissioner does not challenge the ALJ's determination at the first step of the sequential evaluation process that Purdin "has not engaged in substantial gainful activity since November 16, 1998, the alleged onset date." (R. 13).

404, Subpart P, Appendix 1.  (R. 14-16).

The ALJ determined that Purdin

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to work which will only require the claimant to: frequently push/pull leg[] and arm controls, bend, balance, crouch, crawl, kneel, stoop and climb ramps/stairs; occasionally climb ropes/ladders/scaffolds; perform simple, routine and repetitive tasks; have brief, superficial contact with the public; work independently (although the claimant can work in close proximity to others); have supportive, non-threatening supervision; and adapt to minimal changes in the work setting.

(R. 16).

The ALJ found that Purdin "is unable to perform any past relevant work," but that other jobs exist in significant numbers in the national economy that Purdin is capable of performing.  (R. 20).  Therefore, the ALJ concluded that Purdin is not disabled.  (R. 21).

**C. Purdin's Claims.**

Purdin presents the following issue for review:

> Whether the ALJ erred in assigning little weight to an opinion of Purdin's treating psychiatrist, Dr. June Serravezza.

(Doc. 11 p. 4).

## IV.  Discussion

**A.    Substantial evidence supports the ALJ's explicitly articulated reasons for assigning little weight to Dr. Serravezza's November 30, 2009, responses to a questionnaire about Purdin's mental functional capacity.**

On November 30, 2009, Purdin's treating psychiatrist, Dr. June Serravezza, completed a disability questionnaire regarding Purdin's mental functional capacity.  (R. 379-81).  By

circling premarked answers on the questionnaire, Dr. Serravezza indicated that Purdin has a marked constriction of interests; a marked degree of deterioration in personal habits; a marked degree of restriction in daily activities such as the ability to attend meetings, work around the house, and socialize with friends and neighbors; and a marked limitation in his ability to interact appropriately with the general public, get along with co-workers or peers, understand, remember, and carry out simple instructions and repetitive tasks, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain a routine without special supervision, make simple work related decisions, and be aware of normal hazards and take appropriate precautions.  (R. 379-81).  Dr. Serravezza also indicated that Purdin  has an extreme limitation in his ability to understand, remember and carry out complex instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to supervision, respond appropriately to changes in the work setting, and respond appropriately to customary work pressures.  (R. 379-81).  Dr. Serravezza also indicated that Purdin was moderately impaired in his ability to ask simple questions or request assistance.  (R. 379).  At the administrative hearing before the ALJ, an impartial vocational expert provided uncontradicted testimony that, if Purdin suffered from the functional limitations indicated by Dr. Serravezza on the questionnaire, Purdin would be unable to perform any occupations available in the national

economy.  (R. 41-42).

As the ALJ noted, Dr. Serravezza "does have a treating relationship with the claimant, [although] the treatment history is quite brief."  (R. 19).  Thus, Dr. Serravezza meets the definition of a 'treating medical source'" pursuant to 20 C.F.R. 404.1527(c)(2).  Accordingly, to the extent that Dr. Serravezza's responses to the mental functional capacity questionnaire qualify as a medical opinion,[6] the ALJ was obliged to give substantial weight to that opinion unless the ALJ provided clearly-articulated reasons for finding "good cause" to disregard it. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  "'[G]ood cause' exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.*

Dr. Serravezza's responses to the disability questionnaire consist entirely of circled selections from among pre-printed answers.  (R. 379-81).  Although the questionnaire is designed to solicit information in addition to a narrative report[7] from the physician, the record contains no such narrative report.  (R. 379).  Dr. Serravezza left blank the only space on the form for "comments" from the physician.  (R. 380).  Purdin himself acknowledges that

---

[6]*But see* 20 C.F.R. § 404.1527(d)(2)-(3) ("Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability. . . . Although we consider opinions from medical sources on issues such as . . . your residual functional capacity. . . the final responsibility for deciding these issues is reserved to the Commissioner. We will not give any special significance to the source of an opinion on issues reserved to the Commissioner.").

[7]The questionnaire's instructions provide: "In addition to the information provided in your narrative report, please complete items 1 through 20 below by circling the appropriate word."  (R. 379).

Dr. Serravezza "does not explain the basis" of her responses to the questionaire anywhere in the record. (Doc. 11 pp. 8-9). In other words, as the ALJ expressly noted, Dr. Serravezza's opinion "is quite conclusory," and Dr. Serravezza "provid[ed] no explanation of the evidence relied on in forming that opinion." (R. 19). The conclusory nature of Dr. Serravezza's opinion constitutes good cause for disregarding the opinion. *See Phillips*, 357 F.3d at 1241 ("'[G]ood cause' exists when the . . . treating physician's opinion was conclusory."); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Further, the ALJ clearly articulated a number of well-supported reasons why Dr. Serravezza's conclusory opinion was not bolstered by the evidence. First, as the ALJ noted, the medical evidence, including the course of outpatient treatment pursued by Dr. Serravezza, is not consistent with the extreme limitations indicated by Dr. Serravezza's questionnaire responses. *Phillips*, 357 F.3d at 1241("'[G]ood cause' exists when the . . . treating physician's opinion was not bolstered by the evidence . . . or [the] treating physician's opinion was . . . inconsistent with the doctor's own medical records."); *see* 20 CFR § 404.1527(c)(2)(ii) (stating that, in weighing the medical opinion of a treating source, "[w]e will look at the treatment the source has provided"). Beginning in 2001, Purdin spent seven years in prison in Oregon for child molestation and child pornography. (R. 315, 368, 330).

8

The ALJ noted that, although most of the prison medical records relate to complaints of ear infections, shoulder pain, rashes, acid reflux, poor diet due to bad prison food, *etc.*, some treatment notes indicate that Purdin was treated for major depression and anxiety.  (R. 17-18, 277, 275, 200).  Those notes state that Purdin's anxiety and depression were well-controlled with the drug Effexor, and his suicidal ideations ceased while taking the medication.  (R. 277, 275).

In 2008, Purdin was released from prison on parole.  (R. 301).  He reported to South Central Alabama Mental Health Clinic, where Dr. Serravezza practices.  (R. 301). As the ALJ noted, "[d]uring his intake evaluation, [Purdin] alleged numerous psychological symptoms. [Purdin] was diagnosed as suffering from bipolar disorder, anxiety, 'panic,' OCD, and antisocial personality disorder.  These diagnoses were made by Sharon Brown, Ph.D., on December 11, 2008.  It appears, however, these diagnoses were based primarily on the claimant's subjective allegations rather than objective clinical observations."[8]  (R. 18 (citing R. 316)).  Dr. Brown recommended outpatient services in the form of individual therapy, crisis intervention "as needed," a physician assessment "as needed," and medication monitoring.  (R. 316).  Dr. Brown did not recommend "intensive outpatient" services or services such as basic living skills, mental health consult, or diagnostic testing.  (R. 316). *See* 20 CFR § 404.1527(c)(2)(ii) ("We will look at the treatment the source has provided and

---

[8]Notes of objective observations made during Purdin's intake at South Central Alabama Mental Health Clinic include comments such as "[h]e is a good communicator, appears to be intelligent, motivated for treatment, no debilitating medical problems."  (R. 315).

at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.").  The ALJ also observed that Dr. Serravezza likewise "apparently relied quite heavily on the subjective report of symptoms and limitations provided by" Purdin, "and seemed to uncritically accept as true most, if not all, of what [Purdin] reported.  Yet, as explained elsewhere in [the ALJ's] decision, there exist good reasons for questioning [Purdin's] reliability."  (R. 19).  *See* 20 CFR § 404.1527(c)(2) (stating that a treating physician's opinion is due controlling weight *if* the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record").

The ALJ had good cause to question the reliability of the opinions of the treatment professionals at South Central Alabama Medical Health (R. 18-19), including Dr. Serravezza, on grounds that those opinions were based primarily on uncritical acceptance of Purdin's self-reported, subjective allegations (*see*, *e.g.*, R. 401-403) and are not supported by objective observations or diagnostic tests. *Cf. Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir.1995) ("If proof of a disability is based upon subjective evidence and a credibility determination is, therefore, critical to the decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." (citation omitted)). The court recognizes that psychiatric diagnoses are often based to some extent on subjective reports of symptoms rather than on diagnostic test results.  However, the objective observations and diagnostic test results in this medical record, as well as the evidence as a

whole, support the ALJ's conclusion that Purdin's subjective reports are exaggerated, overstated, and not credible. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). *Cf.* 20 CFR § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, *particularly medical signs and laboratory findings*, the more weight we will give that opinion." (emphasis added)).

The ALJ attempted to obtain a mental examination and diagnostic test to confirm Purdin's subjective complaints and psychiatric diagnoses, but Purdin did not cooperate with the testing and the results showed that he was overstating his psychological symptoms. On March 27, 2009, Purdin was referred to Dr. Robert A. DeFrancisco, PHD, MP, Diplomate, Forensic Psychology, Certified Forensic Examiner, Master Psychopharmacologist, for a mental examination. (R. 333). After conducting a mental examination and reviewing Purdin's medical records, Dr. DeFrancisco provided a detailed report of his conclusions and observations. (R. 330-333). Dr. DeFrancisco concluded:

> [Purdin] seems to be of normal intelligence. He certainly can understand, remember and carry out instructions. He cites anxiety as the main reason of not wanting to get out and find a job. He said he couldn't stand being around people. I think this individual needs a [Minnesota Multiphasic Personality Inventory ("MMPI")-II diagnostic test] to objectify his concerns. He certainly seems capable of doing more than he is doing. Restriction of activity and constriction of interest are probably mild to mildly moderate. His appearance is neat and clean. His motivation seemed accurate. He could probably handle

his financial benefits if awarded. As stated, I am recommending the MMPI-II
to help quantify and objectify the diagnosis.

(R. 333).

At the conclusion of the administrative hearing in this case, the ALJ addressed Purdin

as follows:

> Mr. Purdin, I appreciate you taking your time to come in and talk with me
> today. . . . I am going to order an additional test. I'm going to see if I can get
> an MMPI through the set Disability Determination Service. I'm not sure if we
> can order those or not. I'm going to attempt to order an MMPI . If not able to
> get that, I will be ordering an additional psychological CE. Mr. Purdin, you'll
> be getting a notice in the mail which will be setting this additional
> examination, this exam will be paid for by the Social Security Administration.
> And I ask that, for some reason, if you can't make it to the . . . exam, if you
> would just reschedule it, please.

(R. 42).

Purdin agreed on the record to participate in the additional testing. (R. 42). However,

when Purdin reported for the MMPI-II test and an additional mental exam on September 7,

2010, he demonstrated poor effort and motivation and his test responses "clearly suggest[ed]

he [was] overstating his issues, even for a person in an inpatient setting." (R. 425). The test

results indicated that he was "creating a false impression of a mental disorder." (R. 426).

Purdin has not challenged the MMPI-II test results, and he has not challenged the ALJ's

reliance on the test as a basis for finding that his subjective reports of psychological

symptoms lack credibility. The test, and Dr. DeFrancisco's interpretation of it, provide

substantial evidence for the ALJ's credibility finding. *See Vuxta v. Comm'r of Soc. Sec.*, 194

Fed. Appx. 874, 877 (11th Cir. 2006) (holding that, where "the only medical expert whose

records reflect a test determining the veracity of [the claimant's] subjective reports of psychological symptoms" concluded that the claimant was malingering and exaggerating her symptoms, substantial evidence existed to discredit the treating psychologist's assessment of the claimant's social functioning).

Because Dr. Serravezza's opinion was based on Purdin's subjectively-reported symptoms, and because the ALJ relied on substantial evidence in finding that Purdin's subjectively-reported symptoms were not credible, Dr. Serravezza's opinion was not based on credible evidence and the ALJ had good cause to discount it on that basis. *Phillips*, 357 at 1241("'[G]ood cause' exists when the . . . treating physician's opinion was not bolstered by the evidence."); *see also Foote*, 67 F.3d at 1562 ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." ).

Further, as the ALJ noted, Dr. Serravezza's opinion "is not well-supported by [her] examination notes."  (R. 19).   *See Phillips*, 357 F.3d at 1241 ("'[G]ood cause' exists when the . . . treating physician's opinion was . . . inconsistent with the doctor's own medical records.").  In what appears[9] to be Dr. Serravezza's first treatment note, dated February 3,

---

[9]Although it is not absolutely clear from the difficult-to-decipher signature of the treatment provider, it appears that ALJ incorrectly stated in her opinion that "there are not treatment notes from Dr. Serravezza . . . which precede this opinion."  (R. 19).   Purdin does not argue that ALJ's statement on this point is incorrect; however, as the Commissioner candidly acknowledges, the record does appear to contain treatment notes by Dr. Serravezza from examinations of Purdin on three occasions, but those notes do not provide any support for (and in some ways conflict with) Dr. Serravezza's conclusory questionnaire responses.  (Doc. 12 pp. 2, 10; R. 374-75, 415-16).  Thus, the ALJ's understandable failure to recognize Dr. Serravezza's cryptic signature on those notes is, at most, harmless error.  *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding that the harmless error rule prevented reversal of an ALJ's decision).

2009, she stated that Purdin was "currently stabilized on Effexor and relieved not to be suicidal which has plagued him for years in prison (sex offender)." (R. 374). Dr. Serravezza also noted that Purdin's past medications included "antipsychotics and mood stabilizers" that Purdin "tried and rejected" because they made him feel like a "zombie - not [him]self." (R. 374). In a treatment note dated May 9, 2009, Dr. Serravezza stated that Purdin "feels very appreciative of the Effexor for the suicidal thoughts. But having perceptual distortions. Will add Abilify." (R. 375, 415). Dr. Serravezza's November 30, 2009, treatment note, which was completed on the same day as her conclusory responses to the disability questionnaire (R. 379-81), states: "Patient needs disability forms completed today. *Patient has been without Abilify (used and helped) for two weeks*. . . . Forms completed - will continue to prescribe/require meds."[10]  (R. 416 (emphasis added)).

Thus, as the Commissioner points out, according to Dr. Serravezza's treatment notes, Purdin *was not compliant with his treatment* at the time Dr. Serravezza completed the questionnaire. (R. 379). *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (holding that "'refusal to follow prescribed medical treatment without a good reason will preclude a finding of

---

[10]Additionally, while not dispositive in light of the questionnaire's instructions to evaluate the claimant's "current psychiatric/psychological impairment" "within the context of the individual's capacity over time to sustain that activity over normal workday and workweek," the court notes that Dr. Serravezza's November 30, 2009 treatment notes contain objective observations of Purdin (which were made while Purdin was noncompliant with his medications) that seem to contradict her questionnaire responses from the same day. On November 30, 2009, Dr. Serravezza noted that Purdin's "current mental status" was as follows: passive behavior, blunted affect, fully alert, oriented to place, person, and situation (but not to time), depressed mood, goal-directed thought processes, abnormal thought processes (with an explanatory note that Purdin's thought processes were "concrete-limited"), fair recent and remote memory, fair attention span, below average judgment/insight, fair impulse control, and not homicidal or suicidal. (R. 416). These observations, as well as similar observations made on February 3, and March 12, 2009, do not seem to coincide with Dr. Serravezza's questionnaire responses.

disability'" (quoting *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir.1988)).  Further, Dr. Serravezza's treatment notes *are* consistent with Purdin's other medical records which, as the ALJ noted, show that Purdin's psychological symptoms are "well controlled by medications" when he is compliant with treatment.  (R. 18 (relying on an April 9, 2007, treatment note at R. 275 stating that Purdin "has been on Effexor XR since June of 2004 with good control of both depression and anxiety as well as cessation of suicidal ideation.")).[11] *See* 20 CFR § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Furthermore, as the ALJ explained, Dr. Serravezza's opinion is not consistent with Purdin's daily activities.  *See* 20 C.F.R. 404.1527(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive.").  After Purdin was released from prison for child molestation and child pornography, he moved into a trailer behind his mother's home to help take care of his mother.  (R. 368).  His daily activities include using his mother's computer, "do[ing] with kids" (sic), playing video games, watching television, meditating, reading, tinkering with a car, preparing his own meals, cleaning, doing laundry, making small repairs, and performing yard work.  (R. 133, 135, 360, 425).  Every day he spends time with his mother and speaks with his children on the telephone.  (R. 137).  Purdin shops at Wal-Mart

---

[11]See also the correctional facility treatment note from April 7, 2006 (R. 277), which stated: "This inmate has an extensive history of depression, anxiety, and suicide attempts.  He has been on [a number of medications other than Effexor].  None of these medications were effective and some made his symptoms worse.  He has been on Effexor since June of '04 and has a very good response to it.  His depression and anxiety as well as suicidal ideations are controlled.  I feel he needs to stay on Effexor."

once a week and also online for food, books, clothes, music, and games. (R. 136-37). Purdin has a valid driver's license and drives a car. (R. 424). As the ALJ noted, these activities "require an individual to concentrate and maintain focus" and "are more robust that one would expect from an individual suffering from the intense and persistent symptoms" reflected in Purdin's subjective testimony and the marked and extreme limitations indicated by Dr. Serravezza on the questionnaire. (R. 15, 19). *See Phillips,* 357 F.3d at 1241 (holding that the ALJ's decision to accord little weight to the opinion of a treating physician was supported by substantial evidence where the treating physician's "assessment was at odds with [his] prior observations and contrary to [the claimant's] admissions concerning her activities" of daily living).

The ALJ clearly articulated her reasons for finding that Dr. Serravezza's questionnaire responses were not bolstered by the evidence, the evidence supported a contrary finding, and the questionnaire responses were conclusory and inconsistent with the doctor's own medical records. The ALJ's findings are supported by the evidence and they constitute "good cause" for discounting Dr. Serravezza's opinion. *Phillips*, 357 F.3d at 1240 (outlining factors that constitute "good cause" for discounting a physician's opinion). Therefore, the ALJ's decision is due to be affirmed. *See Landry v. Heckler*, 782 F.2d 1551, 1551-52 (11th Cir. 1986) (affirming the denial of benefits where the ALJ's findings were supported by substantial evidence in the record and free of legal error).

16

**B.   The ALJ did not commit reversible error by commenting on Dr. Serravezza's possible motives.**

Purdin argues that, in discounting Dr. Serravezza's questionnaire responses, the ALJ improperly relied on speculation as to Dr. Serravezza's motives, rather than on factors that constitute "good cause" under *Philips* and other controlling cases.   However, the ALJ expressly recognized that improper motives were merely a "possibility" that could not be confirmed.   The ALJ did not make any factual finding as to Dr. Serravezza's actual motives, and the ALJ did not rely on any such finding as grounds for discounting her opinion.   Taken in context, the ALJ's comments about Dr. Serravezza's possible motives constitute nothing more than dicta questioning the reasons for the significant inconsistencies between the evidence as a whole and Dr. Serravezza's conclusory questionnaire responses.   *See U.S. v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("'We have defined dictum as a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.'" (quoting *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir.1988)).

The ALJ discounted Dr. Serravezza's questionnaire responses not because of any question as to motive, but because those responses were not bolstered by the evidence, the evidence supported a contrary finding, and the responses were conclusory and inconsistent with the doctor's own medical records.   *See Phillips*, 357 F.3d at 1240 (outlining factors that constitute "good cause" for discounting a physician's opinion).   Because these reasons are supported by the evidence and they *do* constitute "good cause" for discounting Dr.

17

Serravezza's questionnaire responses, *id.*, the ALJ committed no reversible error. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding that the harmless error rule prevented reversal of an ALJ's decision).

### V. Conclusion

For the reasons as stated, the court concludes that the decision of the Commissioner denying benefits to Purdin should be affirmed. *See Landry v. Heckler*, 782 F.2d 1551, 1551-52 (11th Cir. 1986) ("Because the factual findings made by the [ALJ] . . . are supported by substantial evidence in the record and because these findings do not entitle [the claimant] to disability benefits under the appropriate legal standard, we affirm.").

The Court will enter a separate final judgment.

Done this 14th day of June, 2013.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE